# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TRUE HEATING AND COOLING LLC, on behalf of itself individually and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US LLC, LENNOX INTERNATIONAL INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO. (U.S.), INC., RHEEM MANUFACTURING CO., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC., DAIKIN APPLIED AMERICAS INC., DAIKIN COMFORT TECHNOLOGIES DISTRIBUTION, INC.,THERMAL-NETICS, LLC, ROBERT BOSCH LLC, ROBERT BOSCH GMBH, BHC RESIDENTIAL & LIGHT COMMERCIAL LLC, BOSCH HOME COMFORT LLC, AAON, INC., AAON, INC., AAON COIL PRODUCTS, INC., and BASX, INC.,<br><br>Defendants. | Case No. 2:26-cv-11685<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 9

A. Plaintiff .......... 9

B. Defendants .......... 10

1. The Trane Defendants .......... 10

2. The Lennox Defendants .......... 13

3. The Carrier Defendants .......... 15

4. The Rheem Defendants .......... 17

5. The Daikin Defendants .......... 19

6. The Bosch Defendants .......... 21

7. The AAON Defendants .......... 24

IV. AGENTS AND CO-CONSPIRATORS .......... 26

V. FACTUAL ALLEGATIONS .......... 32

A. The HVAC Equipment Market .......... 34

B. HVAC Pricing .......... 40

C. Defendants Manufacture Substantially Overlapping HVAC Equipment .......... 40

D. The Air-Conditioning, Heating, and Refrigeration Institute .......... 42

E. Pre-2020: Relatively Stable Pricing that Tracked the CPI and Household Appliance PPI .......... 47

F. ACHR News: The Mechanism for Publicizing Price Increase .......... 47

G. 2020: COVID Provides the Opening .......... 48

H. 2021: Three Rounds of Escalating Increases ....................................51

I. 2022: The Coordinated Nine Percent Round, and Beyond................54

J. 2023: Costs Stabilize; Prices Don't.................................................56

K. 2024: Holding the Line ....................................................................59

L. 2025: "Price Discipline" and Rising Prices .......................................60

M. 2026: "The Industry's Generally Been Disciplined for the Past Several Years" .........................................................................................................64

VI. ECONOMIC EVIDENCE CONFIRMS THE CONSPIRACY ....................68

A. Defendants' Profit Margins Reached Historic Levels ........................68

B. Preliminary Regression Analysis Demonstrates Anticompetitive Conduct Caused Significant HVAC Equipment Price Effects ...........71

C. Market Conditions Enabled and Sustained the Conspiracy ...............73

1. Defendants Acted Against Their Independent Economic Self-Interest. .........................................................................73

2. No Close Substitutes for HVAC Equipment Exist ...................75

3. Demand for HVAC Equipment is Inelastic .............................76

4. The HVAC Equipment Industry Is Concentrated and Consolidated. ........................................................................76

5. The HVAC Equipment Industry Has High Barriers to Entry...78

6. HVAC Equipment Is Largely Commoditized ..........................78

7. Defendants Had Numerous Opportunities to Collude .............79

a. The Air-Conditioning, Heating, and Refrigeration Institute ..........................................................................80

b. Other Industry Conferences ............................................83

c. ACHR News ..................................................................83

d. HARDI ....................................................................................84

VII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY ............................................................88

VIII. CLASS ACTION ALLEGATIONS ...........................................................94

IX. ANTITRUST INJURY ............................................................................98

X. CLAIMS FOR RELIEF ..........................................................................100

PRAYER FOR RELIEF ..................................................................................102

DEMAND FOR TRIAL BY JURY .................................................................104

Plaintiff True Heating and Cooling LLC brings this civil antitrust action on behalf of itself individually, and on behalf of a proposed Class of all persons and entities who directly purchased HVAC Equipment[1] manufactured by Defendants in the United States beginning at least as early as January 1, 2020 through the present (the "Class Period").

## I. NATURE OF THE ACTION

1. In February 2026, at an investor conference in Miami, Lennox's chief financial officer, Michael Quenzer, explained how the HVAC industry priced its products. Competing on price, he said, "does not win market share." The industry had "generally been disciplined for the past several years," and Lennox intended to keep "increas[ing] [its] pricing to maintain [its] margins" because "others have generally been as well." This was not a prediction. It was a confirmation of an anticompetitive arrangement that, by that point, had been operating unbroken for six years, generating Defendants billions of dollars in overcharges.

2. Nearly every home and business in America depends on the same equipment to stay warm in winter and cool in summer. Seven manufacturers dominate that market in the United States: Trane, Carrier, Daikin, Bosch, Lennox,

---

[1] For purposes of this Complaint, HVAC Equipment is defined as the appliances used in residential, industrial, and commercial ducted heating, ventilation, and cooling systems.

Rheem, and AAON. Together, they control over 90% of the market for HVAC Equipment sales. Beginning no later than January 2020, these Defendants conspired to inflate the prices of HVAC Equipment sold throughout the United States—and their own executives have said as much in public.

3. The economic data confirms what Quenzer admitted. The chart below compares the Producer Price Index for HVAC Equipment (the "HVAC PPI") against the Consumer Price Index ("CPI"). Beginning in 2020, the two indices diverged sharply—HVAC Equipment prices climbed to unprecedented levels while general consumer prices rose at a fraction of the pace:

**FIGURE 1**




4. Direct purchasers—the distributors, wholesalers, and contractors who buy HVAC Equipment from Defendants or their co-conspirators—were hit with the resulting overcharges.

5. Defendants used two mechanisms to support their price fixing conspiracy. The first, the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), an industry trade association that Defendants largely control. AHRI operated a give-to-get data exchange—to receive competitive intelligence about the industry, a manufacturer had to hand over its own non-public, confidential, and proprietary information. The second was Air Conditioning, Heating & Refrigeration News ("ACHR News"), a specialized trade publication that served as Defendants' preferred channel to broadcast price increases and telegraph their intentions on pricing and supply. Through these mechanisms, Defendants drove a wedge between manufacturing costs and the prices at which they sold HVAC Equipment.

6. When customers complained, Defendants had their story ready: COVID-19 disrupted supply chains, new efficiency standards required expensive redesigns, and federal law forced a costly refrigerant transition. These were not honest explanations; they were cover.

7. The COVID-19 pandemic drove costs up across every manufacturing sector, but HVAC Equipment prices outpaced both general consumer prices and the prices of comparable goods. As Figure 2 shows, the Producer Price Index for major household appliances (the "Household Appliance PPI") tracked the CPI through the same period—only the HVAC PPI broke away. The efficiency standards

Defendants blame took effect in January 2023, but were published in the Federal Register in January 2017, giving them six years of lead time. And the refrigerant phasedown was not imposed on the industry against its will. The HVAC Equipment industry spent more than two decades and billions of dollars preparing for the transition and millions lobbying for it. AHRI's own president even told Congress in 2019 that American manufacturers "invested the most and are the best prepared" to benefit from the change. Defendants may not engineer a regulatory change, invest to profit from it, and then blame it for price increases that far exceed costs.

8. The domestic market for HVAC Equipment—the furnaces, air conditioners, heat pumps, and related systems that heat and cool virtually every home and commercial building in the United States—reached approximately $31 billion in 2024.

9. These products are essential to American businesses and consumers. By working together, Defendants knew they could raise prices without losing sales. In July 2021, as Defendants were announcing back-to-back increases of 6-8%, Paul Johnston, EVP of Co-Conspirator Watsco, put it bluntly: "I don't think there's been much pushback from the consumer at all. . . . The consumer doesn't know what the—what price is. It's not a frequent purchase for the consumer."

10. Defendants did not stop at fixing prices. When demand softened, they coordinated to restrict supply, ensuring that lower volumes would not lead to lower prices. As 2025 progressed, Carrier repeatedly claimed that it was reducing inventory to support prices. In January 2026, Trane's CFO revealed that the company had "reduced factory production days by one-third" and assured competitors publicly: "I don't want anyone to think that pricing is coming down in that market." Lennox's CFO promptly confirmed that Lennox would follow: "We're gonna reduce some production in the first quarter, keep our inventories flat." In a competitive market, a manufacturer that cuts production by a third loses customers to rivals. That Carrier, Trane, and Lennox did so openly is explicable only if each company understood that their competitors would hold the line.

11. The structure of the industry made the conspiracy both easy to execute and hard to detect. HVAC Equipment is a commodity. It is standardized, manufactured to common specifications, and sold primarily on price. In a competitive market, that interchangeability should drive prices down. Instead, Defendants used it to coordinate prices up, confident that customers comparing quotes across brands would see the same inflated numbers everywhere they looked.

12. The results were staggering. Between January 2020 and the present, HVAC Equipment prices rose by approximately 53.5%, far outpacing both general

inflation and the price of comparable manufactured goods. A preliminary regression analysis confirms Defendants' coordinated pricing inflated HVAC Equipment prices by at least 8% above the levels that would have prevailed under competitive conditions. On a $31 billion annual market, that overcharge represents billions of dollars extracted from direct purchasers during the Class Period.

**FIGURE 2**




## II. JURISDICTION AND VENUE

13. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for injuries sustained by

Plaintiff and members of the Class resulting from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations.

14. This Court has jurisdiction under 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

15. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26 and 28 U.S.C. §1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District (e.g., Defendant Bosch's American corporate headquarters, and its American affiliate, Defendant Robert Bosch LLC, are located in this District at 38000 Hills Tech Drive, Farmington Hills, MI 48331), and because a substantial portion of the anticompetitive conduct described herein occurred in this District.

16. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including in this District; (c) maintains substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy directed at and having a direct, foreseeable, and intended effect of causing injury to the business or property of

persons residing in, located in, or doing business throughout the United States, including in this District. In addition to the headquarters listed above, Trane, Carrier, Daikin, and Lennox all have brick-and-mortar premises in this District.

**Table 1: Defendant Premises within Eastern District of Michigan**

| Manufacturer | Establishment Type | Address |
|---|---|---|
| Trane | Commercial Sales Office | 37001 Industrial Road<br>Livonia, MI 48150 |
| Trane | Commercial Sales Office | 5335 Hill 23 Drive<br>Flint, MI 48507 |
| Trane | Parts Supply Store | 251 Executive Drive<br>Troy, MI 48083 |
| Trane | Parts Supply Store | 51150 Century Court<br>Wixom, MI 48393 |
| Trane | Parts Supply Store | 1947 South Industrial Highway<br>Ann Arbor, MI 48104 |
| Trane | Parts Supply Store | 2410 Austins Parkway<br>Flint, MI 48507 |
| Carrier | Commercial Service | 40120 Grand River Avenue<br>Novi, MI 48375 |
| Carrier | Products Distributor | 33601 Schoolcraft Road<br>Livonia, MI 48150 |
| Carrier | Products Distributor | 25799 Commerce Drive<br>Madison Heights, MI 48071 |

| Manufacturer | Establishment Type | Address |
|---|---|---|
| Carrier | Products Distributor | 3229 E. Bristol Rd.<br>Burton, MI 48529 |
| Daikin | Thermal-Netics Headquarters | 3955 Pinnacle Court<br>Auburn Hills, MI 48326 |
| Lennox | Store | 1101 E. Whitcomb<br>Madison Heights, MI 48071 |
| Lennox | Store | 31659 Glendale Street<br>Livonia, MI 48150 |
| Lennox | Store | 201 Appian Way Drive<br>Brighton, MI 48116 |

17. The acts alleged in this Complaint occurred within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on interstate commerce within the United States.

18. No alternative forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. Plaintiff

19. Plaintiff True Heating and Cooling LLC ("True Heating") is a limited liability company registered in Pennsylvania. It purchases, installs, and services residential HVAC equipment in and around Glenshaw, Pennsylvania. During the

Class Period, Plaintiff True Heating purchased HVAC Equipment directly from one or more of the Defendants and their co-conspirators, including Carrier. As a result of Defendants' conspiracy, True Heating paid artificially inflated prices for the equipment needed to operate its business.

**B. Defendants**

**1. The Trane Defendants**

20. Defendant Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane Technologies' North American and United States headquarters are in Davidson, North Carolina. Trane Technologies' common stock trades on the New York Stock Exchange under the ticker symbol "TT." In 2008, Ingersoll Rand Inc. acquired Trane Technologies for $10.1 billion, holding it as a subsidiary before spinning it off as a dedicated climate control company in March 2020. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and Livonia, Michigan, and an HVAC Equipment commercial manufacturing facility in Grand Rapids, Michigan. Trane Technologies' website includes a page entitled "Contact a Trane HVAC Dealer in Michigan" listing over 40 locations in the State of Michigan. Trane Technologies manufactures and markets HVAC Equipment under several brands and product lines, including Trane, American Standard, RunTru, Ameristar, Oxbox, and others. During the Class Period, Trane and/or its predecessors, wholly

owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

21. Defendant Trane U.S. Inc. is a Delaware corporation headquartered in Davidson, North Carolina that manufactures HVAC systems, building management controls, and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies and, according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan. It is defined as the "seller" for Trane Supply in the U.S. per the conditions of sale available on Trane Supply's website.

22. Defendant Mitsubishi Electric Trane HVAC US LLC is a 50/50 joint venture between Trane Technologies and Mitsubishi Electric US, Inc., formed in 2018. The joint venture distributes products under the Mitsubishi Electric brand, as well as specific Trane and American Standard branded systems, and implemented Defendants' supracompetitive pricing. Mitsubishi Electric Trane HVAC US LLC is a Delaware limited liability company headquartered in Suwanee, Georgia.

23. Defendants Trane Technologies, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US LLC are referred to collectively as "Trane" or the "Trane Defendants" in this Complaint. The Trane Defendants manufacture both residential

and commercial HVAC Equipment in the United States. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Trane supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

24. The Trane Defendants operate as a single enterprise under the direction and control of Trane Technologies. Trane Technologies sets pricing strategy for its HVAC Equipment operations in North America, and its subsidiaries and joint ventures execute that strategy. The conspiracy alleged in this Complaint is not among or between the Trane Defendants; rather, Trane, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Trane Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment in interstate commerce, or set prices and strategy for the same, during the Class Period.

### 2. The Lennox Defendants[2]

25. Defendant Lennox International Inc. ("Lennox International") is a publicly traded Delaware corporation headquartered in Richardson, Texas. Lennox International's common stock trades on the New York Stock Exchange under the ticker symbol "LII." Lennox International, either directly or through its subsidiaries, operates stores selling its HVAC Equipment products in Livonia and Madison Heights, Michigan. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, and/or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

26. Defendant Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. According to the Michigan Secretary of State's website, Lennox Industries is licensed to do business in the State of Michigan. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

---

[2] While not named as a Defendant, Advanced Distributor Products LLC ("ADP") is a wholly owned subsidiary of Heatcraft Inc., which is itself a subsidiary of Lennox International Inc. ADP is a Delaware limited liability company headquartered in Stone Mountain, Georgia. ADP manufactures and markets HVAC Equipment under the ADP brand and several product lines.

27. Defendant Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures and markets HVAC Equipment under several brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

28. Defendants Lennox International, Lennox Industries, and Allied Air are referred to collectively as "Lennox" or the "Lennox Defendants" in this Complaint. The Lennox Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Lennox and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly and/or through wholly owned or controlled affiliates, to purchasers in the United States, or set prices and strategy for the same. Upon information and belief, Lennox supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

29. The Lennox Defendants operate as a single enterprise under the direction and control of Lennox International. Lennox International sets pricing strategy for its HVAC Equipment operations, and its wholly owned subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or

between the Lennox Defendants; rather, Lennox, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Lennox Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period under distinct brand names and product lines—Lennox Industries under the Lennox brand, and Allied Air under the Allied, Armstrong Air, AirEase, Ducane, and Concord brands. Both subsidiaries announced price increases throughout the Class Period, often within days of each other at identical percentages, executing Lennox International's unified pricing directives.

**3. The Carrier Defendants**

30. Defendant Carrier Global Corp. ("Carrier Global" or "Carrier") is a publicly traded Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier's common stock trades on the New York Stock Exchange under the ticker symbol "CARR." Carrier Global operates a commercial service facility for HVAC Equipment in Novi, Michigan. Carrier Global's website includes a page entitled "Find a Carrier Expert–Michigan" identifying over 100 locations in the State of Michigan. Carrier Global manufactures and markets HVAC Equipment under several brands and product lines, including Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, International Comfort Products ("ICP"), Keeprite, Day & Night, Viessmann, and others.

31. Defendant Viessmann Manufacturing Co. (U.S.), Inc. is part of the larger Viessmann Climate Solutions entity that Carrier acquired in 2024. It serves as Viessmann's primary manufacturing and distribution facility in the United States, is now a subsidiary of Carrier and is a Rhode Island corporation headquartered in Warwick, Rhode Island. According to the Michigan Secretary of State's website, Viessmann Manufacturing Co. (U.S.), Inc. is licensed to do business in the State of Michigan. Carrier, as used herein, includes Viessmann Manufacturing Co. (U.S.), Inc.

32. Defendants Carrier Global and Viessmann Manufacturing Co. (U.S.), Inc. are referred to collectively as "Carrier" or the "Carrier Defendants" in this Complaint. The Carrier Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Carrier and/or its predecessors, wholly owned or controlled subsidiaries, joint-ventures, distributors, and/or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Carrier supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

33. The Carrier Defendants operate as a single enterprise under the direction and control of Carrier Global. Carrier Global sets pricing strategy for its HVAC Equipment operations in North America, and its subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Carrier Defendants; rather, Carrier, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Carrier Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period and each bear direct or successor liability for the overcharges alleged herein. Viessmann Manufacturing Co. (U.S.), Inc. bears successor liability for its pre-acquisition pricing conduct and, following its acquisition by Carrier in 2024, implemented Carrier's supracompetitive pricing strategy.

**4. The Rheem Defendants**

34. Defendant Rheem Manufacturing Co. is a privately owned Delaware corporation headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment service providers in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial HVAC Equipment markets in the 1970s when it acquired Acme Industries, then headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in 1988. Rheem

Manufacturing Co. manufactures and markets HVAC Equipment under several brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, Russell, Witt, Kramer, ColdZone and others. In December 2013, Rheem Manufacturing Co. acquired Heat Transfer Products Group ("HTPG") from Monomoy Capital Partners. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

35. Defendant Rheem Manufacturing Co. is referred to as "Rheem" in this Complaint. Rheem manufactures both residential and commercial HVAC Equipment in the United States. During the Class Period, Rheem and/or its predecessors, wholly owned or controlled subsidiaries, distributors, and/or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Rheem supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

36. Rheem also bears successor liability for the anticompetitive conduct of HTPG, which Rheem acquired in December 2013; Nortek Global HVAC, which Rheem acquired in October 2024; and Nortek Air Solutions—entities that announced price increases in furtherance of the conspiracy throughout the earlier years of the Class Period.

### 5. The Daikin Defendants

37. Defendant Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan. Daikin's United States corporate headquarters are in New York, New York. In 2012, Daikin acquired Goodman, a residential HVAC manufacturer headquartered in Houston, Texas. In 2022, Daikin acquired Thermal-Netics, an HVAC Equipment sales and services provider headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several brands and product lines, including Daikin, Amana, Goodman, and others.

38. Defendant Daikin Comfort Technologies North America, Inc. is a Delaware corporation and subsidiary of Daikin headquartered in Waller, Texas. At its "Daikin Texas Technology Park" outside Houston, Texas, Daikin Comfort Technologies North America, Inc. engineers, manufactures, markets, and sells HVAC Equipment under several brand and product lines including Daikin, Goodman, Quietflex, and Amana. Daikin changed the name of its United States subsidiary Goodman Global Group, Inc. to Daikin Comfort Technologies North America, Inc. in April 2022.

39. Defendant Daikin Applied Americas Inc. is a Delaware corporation headquartered in Minneapolis, Minnesota, and a subsidiary of Daikin. According to the Michigan Secretary of State's website, Daikin Applied Americas Inc. is licensed

to do business in the State of Michigan. Daikin Applied Americas Inc. manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

40. Defendant Thermal-Netics, LLC is a Delaware limited liability company headquartered in Auburn Hills, Michigan, and a subsidiary of Daikin. According to the Michigan Secretary of State's website, Thermal-Netics, LLC is licensed to do business in the State of Michigan. Thermal-Netics manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

41. Defendant Daikin Comfort Technologies Distribution, Inc. (previously Goodman Distribution, Inc.) is a Texas corporation headquartered in Waller, Texas, and a subsidiary of Daikin. Daikin Comfort Technologies Distribution, Inc. sells residential HVAC Equipment under the Daikin and Goodman brands directly to HVAC contractors.

42. Defendants Daikin, Daikin Comfort Technologies North America, Inc., Daikin Applied Americas Inc., Thermal-Netics, LLC, and Daikin Comfort Technologies Distribution, Inc. are referred to collectively as "Daikin" or the "Daikin Defendants" in this Complaint. The Daikin Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, joint-ventures, distributors, and/or affiliates sold HVAC Equipment in interstate

commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Daikin supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District during the Class Period.

43. The Daikin Defendants operate as a single enterprise under the direction and control of Daikin. Daikin sets pricing strategy for its HVAC Equipment operations worldwide, including in the United States, and its subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Daikin Defendants; rather, Daikin, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Daikin Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period. Daikin Comfort Technologies North America, Inc.—formerly Goodman Global Group, Inc.—and Thermal-Netics, LLC each bear direct and successor liability for their pricing conduct before and after acquisition by Daikin Industries, Ltd.

**6. The Bosch Defendants**

44. Defendant Robert Bosch LLC is a Delaware limited liability company, a wholly owned subsidiary of Robert Bosch GmbH, and serves as the corporate headquarters for North America. It is headquartered in this District, in Farmington

Hills, Michigan and, according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan.

45. Defendant Robert Bosch GmbH is a privately owned corporation headquartered and incorporated in Gerlingen, Baden-Württemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several brands and product lines, including Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

46. Defendant BHC Residential & Light Commercial LLC, formerly known as JC Residential and Light Commercial LLC, ("BHC RLC") is a Delaware limited liability company, a subsidiary of Robert Bosch GmbH, and headquartered in Farmington Hills, Michigan. According to the Michigan Secretary of State's website, BHC RLC is licensed to transact business in the State of Michigan. Robert Bosch GmbH acquired BHC RLC in 2025 from Johnson Controls International PLC's Residential and Light Commercial HVAC.

47. Defendant Bosch Home Comfort LLC, formerly known as Johnson Controls-Hitachi Air Conditioning North America LLC, ("Bosch Home Comfort") is a Delaware limited liability company, a subsidiary of Robert Bosch GmbH, and headquartered in Irving, Texas. Robert Bosch GmbH acquired Bosch Home Comfort; it was formerly a joint venture between Johnson Controls and Hitachi Global Life Solutions, Inc. Bosch Home Comfort remains a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan.

48. Defendants Robert Bosch GmbH, Robert Bosch LLC, BHC RLC, and Bosch Home Comfort are referred to collectively as "Bosch" or the "Bosch Defendants" in this Complaint. The Bosch Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Bosch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Bosch supplied HVAC Equipment to HVAC distributors, supply houses, and/or contractors/dealers, including Johnstone Supply, which operates many locations in this District, including in Detroit, Ann Arbor, Farmington Hills, Flint, Kalamazoo, and elsewhere.

49. The Bosch Defendants operate as a single enterprise under the direction and control of Robert Bosch GmbH. Robert Bosch GmbH sets pricing strategy for its HVAC Equipment operations worldwide, including in the United States, and its subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Bosch Defendants; rather, Bosch, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Bosch Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period, each is subject to personal jurisdiction in this District, and each bears direct or successor liability for the overcharges alleged herein. BHC RLC and Bosch Home Comfort, in particular, bear successor liability for the anticompetitive conduct of Johnson Controls' HVAC business, which Robert Bosch GmbH acquired in a deal announced in July 2024 and which closed in July 2025—conduct that Johnson Controls engaged in throughout the earlier years of the conspiracy.

**7. The AAON Defendants**

50. Defendant AAON, Inc. ("AAON, Inc. (Nevada)" or "AAON") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON's common stock trades on NASDAQ under the ticker symbol "AAON." AAON manufactures and markets primarily commercial HVAC Equipment, including

rooftop units, air handling units, chillers, and condensing units. Airtech Equipment serves as the primary authorized representative for AAON HVAC Equipment in Michigan, with offices in this District in Detroit and in Grand Rapids. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, distributors and/or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

51. Defendant AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON, Inc. entity referenced in the immediately preceding paragraph. AAON, Inc. (Oklahoma) is an Oklahoma corporation headquartered in Tulsa, Oklahoma and engineers, manufactures, and sells highly configurable HVAC systems.

52. Defendant AAON Coil Products, Inc. is a Texas corporation headquartered in Longview, Texas, and a subsidiary of AAON, Inc. AAON Coil Products, Inc., engineers and manufactures semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

53. Defendant BASX, Inc. is an Oregon corporation headquartered in Redmond, Oregon, and a subsidiary of AAON, Inc. BASX engineers, manufactures, and sells a wide range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

54. Defendants AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc are referred to collectively as "AAON" or the "AAON Defendants" in this Complaint. The AAON Defendants manufacture HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, AAON supplied HVAC Equipment to HVAC distributors, supply houses, and/or contractors/dealers, including in the State of Michigan and this District.

55. The AAON Defendants operate as a single enterprise under the direction and control of AAON, Inc. (Nevada). The conspiracy alleged in this Complaint is not among or between the AAON Defendants; rather, AAON, acting as a single enterprise, conspired with the other Defendant families identified herein. Each AAON Defendant is named individually because each engineered, manufactured, or sold HVAC Equipment in interstate commerce during the Class Period. AAON, Inc. (Nevada) sets pricing strategy for its HVAC Equipment operations, and its subsidiaries implement that strategy.

## IV. AGENTS AND CO-CONSPIRATORS

56. Co-Conspirator AHRI is the trade association representing manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. AHRI is based in Arlington, Virginia. As alleged herein, AHRI, at a minimum, facilitated the conspiracy. Executives from several Defendants comprise a substantial part of AHRI's Board of Directors.

57. Co-Conspirator Watsco, Inc. ("Watsco") is a publicly traded Florida corporation headquartered in Miami, Florida. Watsco's common stock trades on the New York Stock Exchange under the ticker symbols WSO and WSOB. Watsco is the largest distributor of HVAC products in North America. Watsco controls approximately 13–14% of the North American HVAC distribution market and distributes approximately 20% of all residential HVAC units in the United States.

58. Watsco maintains various joint ventures with Defendant Carrier Global Corp., including: (1) Carrier Enterprise, LLC ("Carrier Enterprise I"), in which Watsco holds an 80% interest and Carrier holds a 20% interest; (2) Carrier Enterprise Northeast, LLC ("Carrier Enterprise II"), in which Watsco holds an 80% interest and Carrier holds a 20% interest; (3) Carrier Enterprise Canada (L.P.) ("Carrier Enterprise III"), in which Watsco holds a 60% interest and Carrier holds a 40% interest; and (4) TEC Distribution LLC, in which Watsco holds an 80% interest and

Carrier holds a 20% interest. Carrier has the right to appoint board members to these joint ventures, which serve as the exclusive distributors of Carrier and Bryant equipment across most of the U.S. and certain Canadian and Mexican territories. Carrier Enterprise I also owns a 38.4% share in Western U.S. Carrier distributor Russell Sigler, Inc. ("RSI"). Collectively, the Watsco and Carrier Global joint ventures, including Carrier Enterprise I, Carrier Enterprise II, Carrier Enterprise III, TEC and RSI, will be referred to as "Carrier Enterprise." Carrier describes these joint ventures as "integral to our business operations and growth strategy." Products from Carrier and its affiliates accounted for approximately 60–65% of all Watsco's inventory purchases during the Class Period. Combined, Watsco's joint ventures with Carrier represented 53–56% of Watsco's total revenues throughout the Class Period. Watsco also sold hundreds of millions of dollars' worth of HVAC Equipment back to Carrier and its affiliates during the Class Period.

59. Carrier exercised control over the prices at which Carrier Enterprise sold Carrier HVAC Equipment in the U.S. during the class period. Carrier set the base price at which the equipment could be sold, capped the margins Carrier Enterprise could realize on sales of Carrier equipment, and controlled all price deviations. Carrier Enterprise was also required to share with Carrier any profit Carrier Enterprise earned over certain thresholds.

60. Consequently, for the purposes of this Complaint, Carrier Global and Carrier Enterprise operated as a single economic entity, with Carrier Global exercising control over Watsco and Carrier Enterprise in relation to the pricing and sale of Carrier HVAC Equipment to members of the Class.

61. Gemaire Distributors, LLC ("Gemaire") is a Delaware limited liability company headquartered in Deerfield Beach, Florida, and a wholly owned subsidiary of Watsco, Inc. Gemaire was founded in 1969 as a Rheem HVAC distributor and has grown into North America's largest Rheem distributor. Gemaire is the exclusive Rheem distributor across much of the Southeast U.S. On information and belief, Rheem set and controlled the pricing of Rheem HVAC Equipment bought by members of the Class from Gemaire outlets.

62. Rheem and its affiliates accounted for approximately 11% of all Watsco's inventory purchases during the Class Period.

63. Consequently, for the purposes of this Complaint, Rheem and Gemaire operated as a single economic entity, with Rheem exercising control over Watsco and Gemaire in relation to the pricing and sale of Rheem HVAC Equipment to members of the Class.

64. Watsco was privy to, benefitted from, and helped implement, the named Defendants' conspiracy. Watsco meets weekly with its OEM Watsco's executive

team admitted during the Class Period that Watsco: (a) "collaborat[es] closely with [its] OEM partners on current and future pricing actions" (April 2025) (b) maintains pricing systems that are "architecturally collaborative" with each of the Defendants (September 2023) (c) has "visibility into every manufacturer's pricing" before public announcement (October 2024) (d) would "implement [Defendants'] price increases instantaneously" (April 2025) and (e) described the "pricing and margin and discipline and industry discipline and OEM channel partner discipline" during the period, as "across the board . . . pretty consistent and good" and noted that it did not "think that, that changes or stops" (February 2026).

65. Watsco benefited directly from Defendants' coordinated pricing. Its gross profit nearly doubled during the initial years of Class Period, from $1.22 billion in 2020 to over $2.03 billion in 2022, a level it has maintained since. Watsco regularly attributed this improvement directly to Defendants' pricing actions, which it implemented "instantaneously." For example:

66. When reporting on "record breaking" 2021 results, Watsco said: "HVAC/R manufacturers experienced significant inflationary pressures during 2021 and raised prices throughout the year. Watsco in turn raised selling prices, resulting in higher sales and enhanced profitability."

67. Watsco's Barry Logan stated in February 2022: "as we receive higher cost from OEMs and we move that product through to our customers, it is an opportunity for us to be a good merchant and realize some margin dollars as we pass that through."

68. Filings in 2024 also trumpeted "above-average inflationary pricing actions by the Company's suppliers that benefited [Watsco's] sales and gross margins."

69. Barry Logan also stated in July 2024 that "OEM pricing actions year-to-date flowed through [Watsco] and you don't see much variation in equipment margin for [Watsco]."

70. Commenting during Watsco's Q2 2025 Earnings Call, CEO Nahmad stated that "Watsco achieved record gross profit margins . . . and expanded EBIT margins despite lower sales," having "benefited from OEM pricing actions[.]"

71. Various other persons, firms, and corporations not named as Defendants participated as co-conspirators, performed acts, and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for their co-conspirators' acts regardless of whether those co-conspirators are named as Defendants.

72. Each act alleged herein that a Co-Conspirator performed was fully authorized, ordered, or executed by duly authorized officers, managers, agents, employees, or representatives while actively engaged in the management direction or control of its affairs. The acts attributed to Defendants were similarly authorized, ordered, and/or performed by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

73. Every reference to any act of a corporate entity means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

74. Each Defendant acted as the agent or joint venturer of, or on behalf of, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

75. Defendants are also liable for acts taken in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V. FACTUAL ALLEGATIONS

76. Beginning no later than January 1, 2020, Defendants entered into an agreement to fix, raise, and stabilize the prices of HVAC Equipment sold in the

United States. They carried out that agreement through three reinforcing mechanisms: the exchange of non-public competitive data through AHRI, the public signaling of price increases through ACHR News, and coordinated restrictions on manufacturing output. The conspiracy generated unprecedented profit margins for Defendants and billions of dollars in overcharges paid by the distributors, wholesalers, and contractors who purchase HVAC Equipment at the first point of sale.

77. The domestic market for HVAC Equipment in the United States reached approximately $31.26 billion in 2024. Seven Defendant groups—Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON—control over 90% of that market:

**FIGURE 3**




**A. The HVAC Equipment Market**

78. HVAC Equipment—the furnaces, air conditioners, heat pumps, air handlers, and related systems that heat and cool residential and commercial buildings—is manufactured to common industry specifications. The products are standardized. A residential furnace from Trane can replace one from Carrier or Lennox. A commercial rooftop unit from Daikin is functionally interchangeable with one from Rheem or AAON. Purchasing decisions turn primarily on price. That standardization facilitated Defendants' conspiracy: when every manufacturer sells

an equivalent product, coordinating on price requires no complex allocation of customers or territories, only an understanding that no competitor will undercut another's prices.

79. HVAC Equipment falls into two broad categories: residential and commercial. Residential HVAC systems are built from a small set of core components: furnaces, heat pumps, air conditioners, and air handlers, connected by ductwork. Most residential systems use a "split" configuration, pairing an indoor unit with an outdoor condenser. Some use "packaged" units that combine all components in a single outdoor cabinet, common in homes without basements. A third category, ductless "mini-split" systems, serves individual rooms without ductwork and is excluded from the product market alleged in this Complaint because mini-splits are sold through different distribution channels and at different price points than ducted HVAC Equipment.

**FIGURE 4**

**DIAGRAM OF A SPLIT HVAC SYSTEM**



**FIGURE 5**

**DIAGRAM OF A PACKAGED ROOFTOP HVAC SYSTEM**




80. Commercial HVAC Equipment serves a wider range of applications, ranging from retail shops and restaurants to office towers, hospitals, and data centers. These systems must handle higher capacities and more complex requirements, including maintaining different temperatures across different zones within a single building. The principal commercial product categories are: (1) packaged units, self-contained systems that combine heating, cooling, and ventilation in a single cabinet, typically installed on rooftops but also at ground level or on mezzanines, and used primarily for smaller commercial buildings; (2) ducted split systems, pairing an

outdoor condensing unit with an indoor air handler connected by ductwork; (3) variable refrigerant flow ("VRF") systems, which connect multiple indoor units to one or more outdoor units and provide room-by-room temperature control for larger structures such as offices and hotels; and (4) chillers, which produce chilled water to cool entire buildings.

## FIGURE 6

## PACKAGED VS. SPLIT COMMERCIAL HVAC SYSTEMS




## FIGURE 7

## DIAGRAM OF A VARIABLE REFRIGERANT FLOW ("VRF") HVAC SYSTEMS



### B. HVAC Pricing

81. Residential HVAC Equipment prices are broadly uniform across Defendants' brands, typically falling between $4,000 and $15,000 at the manufacturer level, with variation driven primarily by efficiency ratings, capacity, and features rather than by manufacturer identity. A 16 SEER2 heat pump from Trane is priced comparably to a 16 SEER2 heat pump from Carrier or Lennox. Commercial HVAC Equipment follows the same pattern at higher price points, ranging from $5,000 to over $100,000 depending on system type and application, with pricing similarly consistent across Defendants for comparable equipment.

82. This pricing uniformity exists in a market where buyers have no practical alternative to purchasing. When a furnace or air conditioner fails, the owner must typically replace it, regardless of cost. Demand does not decline meaningfully when prices rise. That combination—uniform pricing across competitors and captive demand—gave Defendants both the means and the motive to coordinate.

### C. Defendants Manufacture Substantially Overlapping HVAC Equipment

83. All seven Defendant groups manufacture and sell HVAC Equipment across substantially the same product categories, as Table 2 shows:

## Table 2: HVAC Equipment Lines by Defendant

**HVAC Equipment product categories manufactured by each defendant**

| Product category | Bosch | Trane | Carrier | Daikin | Lennox | Rheem | AAON |
|---|---|---|---|---|---|---|---|
| Residential air conditioners | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Residential heat pumps | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Residential furnaces | ✓ | ✓ | ✓ | | ✓ | ✓ | |
| Air handlers | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Commercial rooftop units | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Commercial split systems | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| VRF / VRV systems | ✓ | ✓ | ✓ | ✓ | | | |
| Chillers | ✓ | ✓ | ✓ | ✓ | | | ✓ |
| Geothermal heat pumps | ✓ | ✓ | ✓ | | | | |

84. Every Defendant produces commercial rooftop units and split systems. The four largest—Trane, Carrier, Bosch, and Daikin—also compete head-to-head in VRF systems and chillers.

85. Moreover, most Defendants market these products under multiple brand names, obscuring the lack of competition, and further expanding the overlap:

**Table 3: Defendants' HVAC Brands**

| Defendant | Brands |
|---|---|
| Trane | Trane, American Standard, RunTru, Ameristar, Oxbox, Mitsubishi Electric |
| Carrier | Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, International Comfort Products (ICP), Keeprite, Day & Night, Viessmann |
| Lennox | Lennox, ADP, Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, Concord |
| Bosch | Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, Johnson Controls, BHC Residential and Light |
| Daikin | Thermal-Netics, Daikin, Amana, Goodman, Quietflex |
| Rheem | Rheem, Ruud, WeatherKing, Sure Comfort, Russell, Witt, Kramer, ColdZone |
| AAON | AAON, BASX, Airtech Equipment |

86. A homeowner or contractor comparing quotes across these brands is often comparing products made by the same small group of manufacturers, without knowing it.

## D. The Air-Conditioning, Heating, and Refrigeration Institute

87. AHRI, the Air-Conditioning, Heating and Refrigeration Institute, is the principal trade association for HVAC Equipment manufacturers in North America. Defendants do not merely belong to it. They run it. In 2026, the AHRI Board included representatives from six of the seven Defendant Groups: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate

Solutions Americas, Gaurang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President Americas, David Budzinski. Only AAON lacked a board seat.

88. AHRI describes itself as "an impartial central agency" for industry data. In practice, it operates an information exchange that makes each Defendant's nonpublic competitive data available to every other Defendant. The system works on a give-to-get basis: to receive industry reports, a manufacturer must hand over its own confidential data on bookings, shipments, sales volume, inventories, and regional market activity. AHRI makes clear that its "statistical data is not for sale" to outsiders, like Plaintiff and the Class. Only companies that contribute their own proprietary information may access the pool. AHRI then compiles the data into more than 150 reports covering over 30 product types, distributed monthly, quarterly, and annually. AHRI has stated that these reports allow each participant to "really get an idea of exactly where they stand in the market" for every product it manufactures.

89. The reports are "based on what the members would like to buy in the reports, what data they'd like to provide." In other words, AHRI gave each Defendant a regularly updated scorecard showing whether its competitors were holding the line.

90. In 2020, the same year the conspiracy began, AHRI launched a new "Executive Dashboard" and companion analytics application. AHRI described the Executive Dashboard as providing "real-time program performance data, industry statistics, and the predictive analytics needed to drive results." The application allowed users to access "data related to individual product performance, which can then be compared to the data of other AHRI certification program participants, along with predictive analysis." In practical terms, the dashboard gave each Defendant the ability to monitor, in real time, whether its competitors' pricing and output was consistent with the coordinated strategy.

91. AHRI provided additional forums for competitors to interact directly. Darcy Lee of Trane chaired its Standards Policy Committee ("StdC") in 2024. The committee "defines the policies and procedures related to development and approval of AHRI standards, guidelines, and stand-alone appendices." Voting members also included executives from Carrier (Dominique Taudin), Lennox (Bruce Perkins), Rheem (Sachin Nehete), and Johnson Controls (now Bosch) (Patrick Marks), meaning that five of the seven Defendant groups sat on a single working committee. AHRI also operates a chat platform called "AHRI Connect," a members-only portal where industry participants "can take part in vibrant discussions and work collaboratively with colleagues across the globe, access documentation instantaneously, and stay abreast of critical news updates." The Complaint does not

allege (because Plaintiff cannot know) what Defendants discussed on these platforms. That information is in Defendants' possession.

92. AHRI's own reports confirm the scope of the data exchange underpinning this conspiracy. AHRI's FAQs related to monthly report, called "Air Conditioning Today," states that all data is furnished by AHRI member companies; that no data is available for sale or otherwise shared to non-members; and that AHRI's 300+ members account for more than 90% of the residential and commercial HVAC Equipment made and sold in North America. *See* excerpt of these FAQs below (highlighted for emphasis). The data exchange, in other words, captured nearly the entire market, and access was limited to competitors willing to share their own numbers.

**FIGURE 8**

**EXCERPT OF AHRI'S AIR CONDITIONING TODAY FAQS (HIGHLIGHTING ADDED)**

**Notes and FAQs**
Industry data is aggregated from the information supplied by AHRI member companies that participate in the Statistics Program and can be subject to revision. Published year-to-date data is inclusive of all revisions. No other AHRI data (e.g., by state or region) is available to the public other than that published. AHRI does not conduct any market forecasting and is not qualified to discuss market trends. BTUHs of 64.9 and below are for residential units; 65.0 and above for commercial.

For previous monthly shipment releases and historical data, please see http://www.ahrinet.org/statistics.

8. Can I purchase additional industry data from AHRI?

No, AHRI statistical data is not for sale.

10. How much of the industry does the data represent?

Although we cannot get into specifics about how much of the industry the data represents, in general, AHRI is one of the largest trade associations in the nation, representing more than 300 heating, water heating, ventilation, air conditioning and commercial refrigeration manufacturers within the global HVACR industry. AHRI's 300+ member companies account for more than 90 percent of the residential and commercial air conditioning, space heating, water heating, and commercial refrigeration equipment manufactured and sold in North America.

93. The board meets in person at least twice a year. In 2026, those meetings are scheduled for June 3 in Arlington, Virginia (where AHRI is based) and November 17 in Rio Grande, Puerto Rico.

**FIGURE 9**

**PLANNED AHRI MEETINGS**

# Future AHRI Meetings

AHRI hosts at least four premier events for our members every year, with each event attracting hundreds of attendees.

| Meeting | 2026 | 2027 | 2028 |
|---|---|---|---|
| AHR Expo | February 2 - 4<br>Las Vegas, NV | January 25 - 27<br>Chicago, IL | February 7 - 9<br>Orlando, FL |
| AHRI State Summit | April 14 - 15<br>Kimpton Sawyer<br>Sacramento, CA | April 27 - 28<br>Renaissance Albany<br>Albany, NY | TBD |
| AHRI Policy Symposium | May 18 - 20<br>Westin DC Downtown<br>Washington, DC | May 17 - 19<br>Westin DC Downtown<br>Washington, DC | TBD |
| AHRI Leadership Forum | November 15 - 17<br>Wyndham Grand Rio Mar Puerto Rico Golf & Beach Resort<br>Rio Grande, PR | November 14 - 16<br>Signia by Hilton Orlando Bonnet Creek<br>Orlando, FL | November 12 - 14<br>Sheraton Grand at Wild Horse Pass<br>Phoenix, AZ |
| Sector Leadership Council Meeting | May 20<br>Westin DC Downtown<br>Washington, DC<br><br>November 15<br>Wyndham Grand Rio Mar Puerto Rico Golf & Beach Resort<br>Rio Grande, PR | May 19<br>Westin DC Downtown<br>Washington, DC<br><br>November 14<br>Signia by Hilton Orlando Bonnet Creek<br>Orlando, FL | May<br>TBD<br>Washington, DC<br><br>November 12<br>Sheraton Grand at Wild Horse Pass<br>Phoenix, AZ |
| AHRI Board of Directors | June 3<br>Arlington, VA<br><br>November 17<br>Wyndham Grand Rio Mar Puerto Rico Golf & Beach Resort<br>Rio Grande, PR | June 2<br>Arlington, VA<br><br>November 16<br>Signia by Hilton Orlando Bonnet Creek<br>Orlando, FL | June TBD<br>Arlington, VA<br><br>November 14<br>Sheraton Grand at Wild Horse Pass<br>Phoenix, AZ |

### E. Pre-2020: Relatively Stable Pricing that Tracked the CPI and Household Appliance PPI

94. Before January 2020, HVAC Equipment prices moved in step with the broader economy. As Figure 1 shows, the HVAC PPI tracked both the CPI and the Household Appliance PPI through the end of 2019. That alignment had held for years. It broke in January 2020, when Defendants launched the first in a series of coordinated price increases. The COVID-19 pandemic, which arrived weeks later, gave them both the opportunity and cover to ramp up their price increases.

### F. ACHR News: The Mechanism for Publicizing Price Increase

95. ACHR News is a specialized trade publication covering the HVAC industry. Throughout the Class Period, Defendants used it to announce price increases to the market.

96. Those announcements followed a distinct and revealing pattern. Defendants used ACHR News not merely to announce price increases but to communicate with each other. The pattern was consistent throughout the Class Period: a Defendant would publish the precise percentage of an upcoming price increase, the specific product lines affected, and the exact effective date, typically weeks before implementation.

97. In a competitive market, that level of advance specificity is irrational. A manufacturer that broadcasts a 9% increase three weeks before it takes effect risks

losing customers to competitors who hold steady or undercut. Yet after COVID, across six years and more than 40 published price increases, the exposed firm was consistently rewarded rather than punished as competitors matched or exceeded the announced increase, usually within days, at nearly identical percentages, through the same publication.

98. That pattern—repeated, specific, advance disclosure met with consistent follow-on rather than competitive exploitation—is not how rivals behave in a competitive market. It is how co-conspirators confirm adherence to an agreement.

99. The chronology that follows documents these more than 40 price increase announcements by Defendants between January 2020 and the present. Across those announcements, a consistent pattern emerges: one Defendant announces a specific increase through ACHR News, and within days or weeks, competitors announce increases at the same or nearly identical percentages, for the same product categories, through the same publication. The increases cluster in narrow bands. The follow-on timing is rapid. And throughout the entire Class Period, the pattern holds without meaningful deviation.

### G. 2020: COVID Provides the Opening

100. Before Defendants could invoke COVID-19 as justification, the pattern was already forming. In a four-week span between mid-November and mid-

December 2019, four Defendant groups announced price increases for early 2020, all in the range of 3% to 6%, all announced in ACHR News. Lennox led on November 15 with a 3%-6% effective January 1, 2020. AAON followed three days later with 5% effective December 5. Daikin's Amana and Goodman brands announced 6% effective February 1. Allied Air, a Lennox subsidiary, announced 4%-6%, also effective February 1. Each announcement was public, each fell within a narrow band, and each was made through the same trade publication.

101. Weeks after those announcements, Defendants' senior executives gathered in Orlando, Florida for AHRI's annual meeting. The attendees included AHRI's Vice Chairman, Mike Schartz, CEO of Daikin Applied, as well as Board of Directors members Gary Bedard, EVP, President, and COO Worldwide Refrigeration at Lennox; Mike Branson, President at Rheem; Elizabeth Haggerty, VP and GM Global Ducted Systems at Johnson Controls (Bosch); Chris Nelson, President Residential and Commercial Systems at Carrier; and Donny Simmons, President Commercial HVACR at Ingersoll Rand (then Trane's parent). Upon information and belief, ACHR News staff attended the AHRI conference and provided coverage of all AHRI and other industry conferences.

102. Then came COVID-19. The pandemic disrupted supply chains across every sector of the economy, and customers expected some price increases as a

result. Defendants used that expectation to push through increases far larger than their actual cost increases warranted, knowing that buyers would attribute the higher prices to the pandemic rather than to coordination.

103. With COVID as the backdrop, Defendants began announcing price increases in rapid succession, each one through ACHR News. Johnson Controls (Bosch) went first in August 2020, raising prices up to 6% and citing "escalating frontline manufacturing costs" from the pandemic. Trane followed in September with a matching 6% increase on commercial equipment. AAON announced 4% in October. By November, Trane was back with a larger increase, up to 8%, covering residential and commercial equipment across all its brands. Lennox matched within a week at 4%-6%. Before the year was out, Nortek Air Solutions (Rheem) announced 3%-9%, Nortek Global HVAC (Rheem) announced 6%, and Allied Air (Lennox) announced 4%-6%, each blaming some combination of labor costs, raw materials, and supply chain pressures.

104. Every one of these announcements was public. Each was disseminated through the same trade publication. Each cited the same generalized cost justifications. And the percentages clustered in the same narrow range. What no Defendant did was compete for market share by holding prices steady while a competitor raised them.

105. In December 2020, Congress enacted the AIM Act, mandating the phasedown of hydrofluorocarbons ("HFCs"). This prohibition covered R-410A, the primary refrigerant used in air conditioning condensers and heat pumps. The prohibition would not take effect until January 1, 2025, five years later, but Defendants began citing the transition as justification for price increases almost immediately, adding it to the growing list of pretexts alongside COVID-related cost pressures.

**H. 2021: Three Rounds of Escalating Increases**

106. **Spring 2021, The 6%-7% Round.** The pace accelerated sharply in 2021. In March and April alone, five Defendant groups announced price increases on overlapping timelines. Rheem's Russell HTPG subsidiary led with approximately 5% on commercial equipment in early March, citing raw material costs. Trane announced up to 7.5% on commercial equipment on March 8, then followed with up to 6% on residential equipment three weeks later. AAON raised commercial prices by 4% on March 9. Lennox announced 6%-9% across all residential and commercial equipment on April 12, with its president blaming "inflationary pressures on raw material costs." Daikin matched at 6% on commercial equipment three days later. Allied Air (Lennox) added 5%-7% on April 19. Within six weeks, every major manufacturer had raised prices, and each one pointed to the same input cost pressures to explain it.

107. **Summer 2021. 7%-8% More.** By summer, the increases were larger and the follow-on times shorter. Carrier raised prices up to 7% effective June 1. Within weeks, AAON announced 5% and Johnson Controls (Bosch) 3.5%. Then Trane announced 7% on both commercial and residential equipment in early July. Five days later, Carrier came back with up to 8%. Lennox matched at 8% on July 23, the same day Allied Air (Lennox) announced its own 8% increase. Nortek Air Solutions (Rheem) closed the round in August at 8%-12%. Defendants were no longer merely tracking each other. They were raising prices in tandem, at nearly identical percentages, within days of one another.

108. Defendants publicly acknowledged these parallel price increases. In an August 2021 earnings call, Trane CEO Dave Regnery publicly boasted that "from what we're seeing in the market, the entire industry, are implementing price changes faster and with far less lag time . . . ." For the Trane Defendants, their ability to coordinate price timing with competitors can be attributed to their ability "to really hone in what we need to do in pricing real time almost." When asked whether competitors were trying to steal market share given the pricing environment, Lennox CEO Todd Bluedorn responded by highlighting Lennox's competitor's parallel price increases in 2021 and stating, "we're all in the pool together."

109. **Fall 2021. Another 10-13%.** The final quarter of 2021 brought the largest increases yet. Lennox announced 13% on commercial equipment in October, the single largest published increase to that point. Carrier followed within days at up to 12% on commercial and 10% on residential equipment. Lennox matched its own commercial number on the residential side, announcing 13% on residential equipment in early November. Allied Air (Lennox) added 12%. Trane closed the year with up to 12% on both residential and commercial equipment, splitting the effective dates across January and mid-January 2022. Meanwhile, AAON announced its fourth price increase in twelve months, and Daikin as well as Rheem's HTPG subsidiary both raised commercial prices. By the end of 2021, Defendants had collectively imposed multiple rounds of increases totaling well above 20% each on most product lines, a pace of escalation without precedent in the HVAC Equipment industry. As Carrier's CFO, Patrick Goris, said in November 2021: "it's our intention to capture pricing and retain that pricing. I would say that we've seen . . . all of our competitors raise prices as well . . . . But so clearly, we've seen discipline in the market."

110. Across 2021, Defendants announced more than 20 separate price increases on HVAC Equipment. Not one Defendant responded to a competitor's price increase by holding its own prices steady to compete for market share. Instead, each increase was met with a matching or larger increase from one or more

competitors within days or weeks. The consistency of this pattern, across supposedly independent companies selling to thousands of customers nationwide, is not explained by parallel responses to common cost pressures. It is explained by an agreement.

### I. 2022: The Coordinated Nine Percent Round, and Beyond

111. **Spring 2022. The 9% Match.** The spring of 2022 produced the most striking coordination in the Class Period. AAON announced a 7% increase on commercial equipment on March 2. One week later, Carrier announced up to 9% across residential, light commercial, and commercial equipment. Commenting on industry price increases on March 15, Carrier's CFO, Goris, trumpeted the fact that "generally, the industry has been able so far to pass on pricing." On March 28, Lennox matched at exactly 9%. On April 4, Trane matched at exactly 9%. On April 18, Rheem's Russell HTPG matched at exactly 9%, effective on May 1, the exact same day as Trane's price increase. On April 18, Allied Air (Lennox) also matched at 9%. Four of the seven Defendant groups announced the identical price increase within three weeks of each other, with a fifth close behind. The probability that five independent companies facing different cost structures, different product mixes, and different regional exposures would independently arrive at the same percentage and announce it within weeks through the same trade publication, is vanishingly small.

112. **Summer 2022. The Commercial Escalation.** The summer brought a second wave focused on commercial equipment, with even larger increases. Daikin led on May 10 with up to 12% on commercial equipment. One week later, Trane announced up to 18% on select commercial equipment, the largest single published increase to that point. Carrier followed on May 26 with up to 12% on light commercial and commercial equipment. Lennox announced up to 14% on commercial equipment in late June, and Allied Air (Lennox) matched at 14% a month later. Daikin and Trane each announced additional commercial increases in late July and September, at 5% and 3%-6% respectively. Meanwhile, AAON adopted a novel approach: beginning June 1, 2022, it implemented a rolling 1% monthly price increase on all commercial equipment, compounding automatically. AAON later reported that "pricing comprised 22.0% of growth" for the year.

113. A company that unilaterally raises prices by 1% every month in a competitive market loses customers to rivals who hold steady. AAON's willingness to adopt this strategy, openly and indefinitely, is consistent only with confidence that its competitors would continue raising prices in parallel.

114. **Fall 2022. The Year-End Hikes.** The year closed as it began, with another round of matched increases. Carrier announced up to 8% on commercial equipment in mid-November. Lennox announced up to 8% on residential and

commercial equipment on December 5. Allied Air (Lennox) matched at 8% four days later. Trane announced up to 10% on residential equipment the same day. Once again, the percentages clustered within a tight band, the announcements came within days of each other, and each one was published through ACHR News.

115. By the end of 2022, the cumulative effect of Defendants' coordinated increases since January 2020 was staggering. The HVAC PPI had climbed approximately 39.4% in three years, far outpacing both the CPI and the Household Appliance PPI. *See* Figure 2. Defendants' profit margins expanded to levels the industry had never seen. And not once during the year did any Defendant respond to a competitor's price increase by holding (let alone reducing) its own prices to gain market share. The pattern held: every increase was met with a match or a raise, never with competition.

### J. 2023: Costs Stabilize; Prices Don't

116. **Early 2023. Signaling Through Earnings Calls.** By 2023, the raw material cost pressures Defendants had cited to justify three years of price increases were easing. Steel, copper, and aluminum prices had retreated from their 2022 peaks. But Defendants' prices did not follow. Trane opened the year with a 4%-7.5% increase on commercial equipment effective January 14. Then, during their February earnings calls, Trane and Carrier delivered nearly identical messages to investors. Trane reported that "strong volume growth, positive price realization and

productivity more than offset material and other inflation." Carrier echoed that "strong price realization more than offset unprecedented inflation." Both companies were telling the market the same thing: costs were no longer rising faster than prices. Defendants were making money on the spread and intended to keep doing so.

117. **Spring and Summer 2023. Continued Increases and "Discipline."** In April, executives from Carrier, Daikin, Johnson Controls (Bosch), Mitsubishi, and Rheem attended the ACCA Conference and Expo in New Orleans, providing another opportunity for direct interaction. Trane announced another 4%-6% increase on commercial equipment in May. Again, in tandem with this price increase, Trane publicly signaled to its competitors to remain disciplined on price. Trane's CFO Christopher Kuehn stated in a May 2023 earnings call that "[t]hings remain to be very disciplined as we see today" and that "it's an industry that typically retains price and is disciplined on price."

118. Daikin subsidiary Goodman raised parts prices 5.2% in July. But the most revealing moment came from Lennox. In July 2023, CEO Alok Maskara told investors: "Regarding price versus inflation, we are pleased to report that the *industry pricing remains disciplined*, and our own mid-year price increase has been broadly successful." (emphasis added). He continued: "We expect the second half of the year to deliver a positive price versus inflation spread." Maskara was not

describing competition. He was describing coordination. A "positive price versus inflation spread" means prices are rising faster than costs, and "disciplined" industry pricing means no competitor is undercutting to capture share. His comments echoed those of Carrier's CEO Gitlin, who stated on March 15, 2023, that Carrier had "really leaned into making sure that we have the pricing discipline[.]"

119. **Fall 2023. The Year-End Hikes.** The fall brought another coordinated round. Bosch raised heat pump prices in August. Trane announced 2%-6% on commercial equipment in September. Lennox followed with up to 8% on commercial equipment in October. Carrier matched at 8% on commercial equipment in November. Trane then announced up to 5% on residential equipment, and Lennox followed within two weeks with up to 10% on residential equipment. Allied Air (Lennox) closed the year with up to 10% on residential and 12% on commercial equipment, effective January 2, 2024. Bosch subsidiaries Coleman and Evcon implemented 8% increases effective December 31. By now, the annual cycle was entrenched: fall announcements for increases taking effect in January, each Defendant waiting just long enough after a competitor's announcement to maintain the appearance of independent decision-making but never long enough that the pattern could be mistaken for anything but coordination.

**K. 2024: Holding the Line**

120. The annual cycle repeated. Carrier opened 2024 with a January announcement of 6%-10% across all products, specifying that residential would rise 6%, light commercial 8%, and commercial 10%. Bosch raised heat pump prices 6% effective January 12. Nortek Global HVAC (soon to be acquired by Rheem) announced up to 8% on residential equipment in late January. Trane followed with 2%-6% on commercial equipment effective February 10. Daikin raised residential prices up to 7% effective February 1 and commercial prices 8%-10% effective April 1. Trane closed the year with a commercial increase effective January 2025, most increases falling between 2% and 5%. Over the course of the year, Rheem raised prices 8%-15% through a series of public announcements.

121. Meanwhile, the market consolidated further. Carrier acquired Viessmann Climate Solutions in January. Bosch announced it had reached a deal to purchase Johnson Controls' HVAC business in July 2024. Rheem completed its acquisition of Nortek Global HVAC in October, absorbing the Frigidaire, Maytag, Miller, and Broan brand lines. Fewer competitors meant fewer potential defectors from the pricing arrangement. In September, Lennox's CFO observed what the numbers confirmed: "Shares don't shift a lot in our industry."

### L. 2025: "Price Discipline" and Rising Prices

122. **The Early 2025 Increases.** The year opened with another cascade of price hikes. Allied Air (Lennox) announced 5% on residential parts and commercial equipment effective January 13. Trane announced 10% on residential equipment effective February 1. Daikin announced 8%-10% on all residential and commercial equipment, with its Goodman and Amana subsidiaries issuing identical announcements the same day. Carrier raised residential prices 6%, light commercial 8%, and commercial 10% effective March 1. AAON imposed a 6% surcharge effective March 31. In April, Rheem, Lennox, Daikin, and Bosch all announced increases ranging from 2% to 10%, with most taking effect on or around April 1. Six Defendant groups raised prices within a single quarter, all through public announcements, all within a narrow band.

123. Carrier spoke in May 2025 of supporting these price increases with reductions in its inventory levels. In July 2025, Lennox CEO Alok Maskara indicated that Defendants had no intention of stopping their price increases. When asked if the industry would be able to retain its pricing position, he responded, "[i]f history is of any guide, us and other players will continue to be price disciplined."

124. **September 2025. The Morgan Stanley Laguna Conference.** In September, senior executives from Carrier, Lennox, and Trane gathered at the 13th

Annual Morgan Stanley Laguna Conference. Over the course of two days, they delivered a coordinated message to the market and to each other.

125. Carrier went first. When asked whether price competition might emerge in the residential market, CFO Patrick Goris dismissed the possibility, noting that "the combination of the price and the mix up is still double-digit positive." Goris' comments followed CEO Gitlin's July 29, 2025 confirmation that Carrier was "going to consciously pull down inventory in the second half of the year" and work with its distributors, like Watsco, to ensure supply "balance" to support prices.

126. Lennox's CFO Michael Quenzer spoke the next day. He praised the industry's pricing discipline, described the input cost pressures all Defendants faced and then told the room what would happen next: "I expect price and cost to continue to go up. I don't think inflation is going to stop here. I think the next level will be early next year when we all come out and announce our next full round of price increases. For the balance of the year, I think we're pretty well set from a price perspective. Next year, we'll do our annual price increase, and just like we always do, we expect similar results by others."

127. Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke that day. Regnery revealed that Trane had restricted supply, consistent with Carrier's and

Lennox's call for discipline: "We have taken some time out of our factory so that we can balance the inventory load within the channel."

128. Three companies. Two days. Each one publicly confirming its commitment to higher prices and its expectation that competitors would do the same. Quenzer's statement that "we expect similar results by others" was not a prediction. It was an assurance.

129. **Fall 2025 to Year-End.** Trane raised commercial prices in late September, with most increases at 1%-4%. During Trane's October 2025 earnings call, CEO Regnery, asked about his expectations regarding continued pricing discipline, stated that "on Resi [residential HVAC], the industry has remained disciplined." Bosch closed the year with increases across its heat pump, Coleman, and Evcon brands, ranging from 3% to 8% effective December 31.

130. In November, Carrier's CFO, Patrick Goris, was asked about pricing pressure given declining volumes. He confirmed that "overall pricing was up double digits year-over-year" and telegraphed an upcoming increase in the "mid-single-digit range," continuing the pattern of public price signaling.

**FIGURE 10**
**TRANSCRIPT OF CARRIER CFO PATRICK GORIS'S COMMENTS AT NOVEMBER 2025 BAIRD GLOBAL INDUSTRIAL CONFERENCE (HIGHLIGHTING ADDED)**

**Patrick P. Goris**
*Chief Financial Officer & Senior Vice President, Carrier Global Corp.*

A

It certainly is a watch item, because as you say, when volumes are down so much, it's the natural question that comes up. In Q3, our overall pricing was up double digits year-over-year. Now, that's a combination of the mix-up

with the new units, with the new refrigerant, which are more costly than the prior units and some price increase. Some of that, of course, relates to some of the input cost increases that we've seen. This quarter, the increase will probably be a little bit less year-over-year, but only because we're starting to lap quarters last year when we started selling the new refrigerant units.

And so, our intention is still that we would announce a price increase in residential in the Americas for next year, likely in the mid-single-digit range. And one of the reasons is we see continued to increase in some of the input cost. If you look at what copper has done, what aluminum is doing, we see some increases there. And so, we would expect to realize, call it, low-single-digit prices – price increases in the Americas resi for that reason.

131. In December 2025, Carrier's David Gitlin reiterated this point, acknowledging Carrier's position as industry leader and publicly confirming Carrier's commitment to pricing discipline on a forward-looking basis:

> *But look, we have a disciplined market. We are the clear market leaders*. And if you kind of look at a buying decision for a homeowner to buy a $10,000 unit, if we move price on the product, forget the cost of the insulation, our product's a relatively small percent, *we move price a couple of points, it's not going to swing the buying behavior of the ultimate customer.* So where you get into pricing discussions is when you have people that are doing unnatural acts out in the industry that drives a behavior that takes hold that drives pricing down for the entire industry. *And we believe, as market leaders, that we – it's important for us to retain pricing discipline*, *and you should expect that out of us as we go into next year*. (emphasis added).

It is only in a cartel setting that competitor price competition is seen by a market leader as an "unnatural act." In a competitive market, aggressive pricing wins

customers and shifts market share. Stable shares in the face of years of supracompetitive pricing is a hallmark of a functioning cartel.

### M. 2026: "The Industry's Generally Been Disciplined for the Past Several Years"

132. Effective January 1, 2026, Lennox increased commercial HVAC Equipment prices by up to 5%.

133. During Trane's January 29, 2026 Earnings Call, Executive Vice President and CFO, Chris Kuehn, revealed that Trane "reduced factory production days by one-third" to "normalize residential inventory." He explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. If I think about the fourth quarter and pricing is really is more due to volume being lower than anything else." Then Kuehn reassured Trane's competitors that Trane would not cut prices: "I don't want anyone to think that pricing is coming down in that market."

134. The next day, ACHR News reported that Lennox CEO "[Alok] Maskara reinforced that pricing discipline remains consistent across the industry." Maskara affirmed Lennox's commitment to the price increases it observed from competitors: "Based on everything we have seen so far, we see our competitors aiming at similar price increases." A week later, on February 4, 2026, Daikin's Senior Executive Officer Koichi Takahashi announced price increases, saying, "We

are not increasing our market share by lowering our selling prices." The next day, February 5, 2026, Carrier CEO David Gitlin declared, "we have no intent of losing any share while maintaining price."

135. Effective February 16, 2026, Lennox increased residential HVAC Equipment prices by up to 10%.

136. Then came the Barclays 43rd Annual Industrial Select Conference held February 17-19, 2026, in Miami, Florida. In a two-day span, executives from Lennox, Trane, and Carrier appeared at the same conference and continued to overtly and publicly signal to each other.

137. On February 17, Lennox's CFO Michael Quenzer went first. Asked about residential pricing, he confessed:

> The industry's generally been disciplined for the past several years. We've had cost inputs coming into our business. Others have as well, and we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share.

138. He also announced that Lennox would restrict production to support the pricing structure: "[W]hat we're gonna do is reduce some production in the first quarter, keep our inventories flat." By complimenting the industry for its discipline, Quenzer acknowledged that Lennox and its competitors would no longer compete for market share by, for example, lowering prices to win customers from

competitors, which is inconsistent with the behavior of competitors in a market free from an anticompetitive agreement. This sentiment explains Carrier's CEO, David Gitlin's and Daikin's Takahashi's, confidence that Carrier and Daikin could maintain price without risking losing market share.

139. Trane's CFO Chris Kuehn presented the same day, emphasizing the 5% increase Trane had announced days earlier (matching Lennox), "effective April 1," and highlighting Trane's "plans [] to make sure [it] continue[s] to capture price to offset inflation and still get a spread on that." He attributed Trane's ability to raise prices to the fact that "the industry has been very disciplined in that regard over many years." When asked, in the industry-wide context, if "people are behaving themselves on the whole on price," Kuehn replied that "we don't see pricing going backwards."

140. Two days later at the conference, Carrier's Chairman and CEO, David Gitlin, mentioned Carrier's matching 5% increase: "If you look at our residential businesses in terms of realization rates . . . . In the Americas, we have 5% price that we've announced comes into place next month." Gitlin, commenting on those price increases, stated further: "it only makes sense to raise prices . . . . And I think our competitors seem to be rational and in the same boat."

141. Three companies used the word "discipline" or "disciplined" at the same conference to describe the same pricing behavior. This was not independent decision-making by competitors responding to common market conditions. This was a public confirmation of a private understanding.

142. The increases continued into March. Daikin raised light commercial and commercial prices up to 7% and other equipment 3.5%-5% on March 2. The same day, Daikin's Amana and Goodman brands announced up to 7%, and Carrier's Viessmann and ICP/Heil/Tempstar subsidiaries increased prices 3%-5% and 4%, respectively. Allied Air (Lennox) matched Daikin's 7% effective March 16.

143. Tellingly, on April 1, just weeks after end-users first sued Defendants for their anticompetitive scheme in *Berg v. Robert Bosch LLC*, No. 2:26-cv-10949-SKD-APP (E.D. Mich.) ("End-User Suit"), ACHR News broke news of the first HVAC equipment price decrease in years:

**FIGURE 11**

**ACHR NEWS ANNOUNCING PRICE DECREASES AFTER BERG ACTION WAS FILED**



Air Conditioning | Heating | Refrigeration

the NEWS HVAC BREAKING NEWS

4/2/2026

HVAC PRICE INCREASE

**HVAC Price Increase List: April 2026**

For the first time since the HVAC Price Increase List was launched, we are finally reporting a decrease.

READ MORE

144. However, in the weeks since the first complaint was filed, Defendants have continued their lockstep price increases. Carrier announced an 8% increase effective April 27, and Lennox and Rheem followed with identical 8% increases effective May 18 and 22, respectively.

## VI. ECONOMIC EVIDENCE CONFIRMS THE CONSPIRACY

### A. Defendants' Profit Margins Reached Historic Levels

145. Since 2020, Defendants reported rising and record profit margins. Morningstar noted in its mid-2024 coverage of Lennox that the company's margins had climbed "from about 8% during the last sales peak in 2007 to nearly 18% in 2023." Carrier too experienced significant profit increases of around 20% from 2020

to 2021 and again from 2023 to 2024, corresponding closely to its price increase announcements.

146. In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

147. During its earnings call on January 29, 2026, Trane reported that revenue nearly doubled from approximately $12 billion to $21 billion between 2020-2025—a compound annual growth rate of approximately 11%. Adjusted earnings per share grew at a compound annual growth rate of approximately 24% over the same period, and that adjusted EBITDA margin expanded by 470 basis points to reach 20% in 2025:

## FIGURE 12

## EXCERPT FROM TRANE FULL YEAR 2025 FINANCIAL RESULTS




148. AAON's own disclosures were equally revealing. In May 2023, the company reported that "[g]ross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022. Price increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion." In other words, costs were falling, and prices were still rising. As Figures 1 and 2 demonstrate, the HVAC PPI diverged sharply from the CPI and the Household Appliance PPI beginning in 2020 and never returned.

### B. Preliminary Regression Analysis Demonstrates Anticompetitive Conduct Caused Significant HVAC Equipment Price Effects

149. The profit data is consistent with the findings of a preliminary economic analysis. A preliminary regression analysis conducted by experts retained in the related End-User Suit examined the relationship between the price of HVAC Equipment and the various input costs and non-collusive factors that independently affect those prices (e.g., cost and demand factors) to isolate the price effects attributable to the alleged conspiracy. The analysis demonstrated that Defendants' coordinated price-fixing during the Class Period generated prices significantly higher than those that would have prevailed under competitive conditions.

150. The analysis compared actual HVAC Equipment prices during the Class Period against estimated competitive prices derived from a period unaffected by the conspiracy, controlling for non-collusive factors:

**FIGURE 13**

**COMPARISON OF ACTUAL AND BUT-FOR HVAC SYSTEM PRICES**




151. The analysis controlled for 19 independent variables, including raw material costs (steel, copper, aluminum, plastics, compressors), labor and energy costs, housing starts, consumer income, import and export pricing, the refrigerant transition, inflation, the COVID-19 pandemic, and seasonal effects.

152. After controlling for all of these factors, the analysis found that actual HVAC Equipment prices remained significantly higher than predicted competitive prices throughout the Class Period. The estimated overcharge is 8%. On a market

generating approximately $31 billion in annual revenue, that overcharge represents billions of dollars extracted from direct purchasers. Because direct purchasers buy from Defendants, they were exposed to the overcharge first.

### C. Market Conditions Enabled and Sustained the Conspiracy

#### 1. Defendants Acted Against Their Independent Economic Self-Interest.

153. A firm acting unilaterally in a competitive market would not voluntarily surrender market share by slashing production and reducing inventory while demand persists. Yet that is precisely what Carrier, Trane and Lennox did—and their executives explained why in public, using language that only makes sense if they had assurance their competitors would not expand production to take market share.

154. Most strikingly, Trane voluntarily slashed production by one-third. During its January 29, 2026, Earnings Call, Trane's CFO Chris Kuehn revealed that Trane "reduced factory production days by one-third." In a competitive market, the market leader cutting output by 33% is an invitation for rivals to capture its share. No profit-maximizing firm would accept that risk unilaterally. Yet Trane acted with confidence, and Kuehn signaled why, assuring competitors: "I don't want anyone to think that pricing is coming down in that market."

155. Weeks later, Lennox confirmed the coordination. At the Barclays conference on February 17, 2026, Lennox CFO Michael Quenzer announced Lennox

would match: "So what we've been trying to do is very disciplined, kind of reduce our inventory levels . . . . So what we're gonna do is reduce some production in the first quarter." That Lennox publicly committed to matching Trane's production cuts and Carrier's previously announced inventory run-down—rather than seizing the competitive opportunity those cuts presented—is inexplicable absent a common understanding.

156. Defendants' pattern of publicly broadcasting detailed pricing information through ACHR News—including specific percentages, effective dates, and product categories—well in advance of implementation is similarly contrary to independent self-interest. A firm acting competitively guards its pricing decisions because advance disclosure invites rivals to undercut. Defendants did the opposite, broadcasting their plans precisely so competitors could match. And match they did—every increase, every time, often within days at identical percentages.

157. Defendants' executives confirmed that they had abandoned competition for market share entirely. Carrier's CEO David Gitlin stated, "We believe, as market leaders, that we—it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year." Lennox CEO Alok Maskara declared, "Based on everything we have seen so far, we see our competitors aiming at similar price increases." A CEO cannot know with confidence what

"similar price increases" his competitors are "aiming at" unless that information has been shared or coordinated. In a competitive market for commodities like HVAC equipment, a market leader leverages superior operational efficiency to win customers on price. Defendants leveraged their market position to raise prices and encourage their rivals to do the same—conduct that is rational only in the presence of an agreement.

### 2. No Close Substitutes for HVAC Equipment Exist

158. According to the U.S. Census Bureau's Survey of Construction, 95.4% of new single-family homes started in 2020 had central air conditioning. The U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all U.S. homes have central air conditioning and over 73% have central heating.

159. HVAC Equipment is equally prevalent in commercial buildings; the U.S. Energy Information Administration reports that 83% had space heating in 2018 and 78% had space cooling.

160. HVAC Equipment is critical for comfort, indoor air quality, and safety during periods of winter cold and summer heat. No significant substitutes exist. As Lennox's CFO, Michael Quenzer, explicitly recognized, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

### 3. Demand for HVAC Equipment is Inelastic

161. When demand is inelastic, a price increase has little or no effect on demand. Goods without reasonable substitutes have inelastic demand.

162. HVAC Equipment demand is inelastic. When equipment fails, owners find it difficult to delay purchasing a replacement even at elevated prices because of the critical importance of HVAC Equipment to temperature regulation, comfort, indoor air quality, and safety.

163. HVAC Equipment industry leaders even admit the industry's inelasticity. Trane CEO, David Regnery, has publicly stated that when consumers experience multiple rounds of price increases within a year-and-a-half, the industry does not see demand destruction. Similarly, when reflecting on price increases, Carrier CEO has stated, "fortunately, we're in markets where we sell essential products . . . when your air conditioner breaks, when it's really hot outside, you're going to replace it. So I think we've seen an ability to increase price and retain it . . . ."

### 4. The HVAC Equipment Industry Is Concentrated and Consolidated

164. Concentrated markets are more susceptible to collusion. The U.S. DOJ recognizes, "Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids,

customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers, and the rest are 'fringe' sellers who control only a small fraction of the market." Seven companies dominated the HVAC Equipment market with a combined share exceeding 90% during the Class Period.

165. Using data from 2020, the Herfindahl-Hirschman Index ("HHI")[3] score for HVAC Equipment exceeded 1,588, approaching the 1,800-point threshold the DOJ and FTC consider highly concentrated.

166. The HVAC Equipment market also experienced significant consolidation during the Class Period. Carrier acquired heat pump manufacturer Viessmann Climate Solutions in January 2024. Rheem completed its acquisition of Nortek Global HVAC in October 2024, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under the Rheem umbrella. In July 2025, Bosch completed its previously announced acquisition of Johnson Controls' residential and light commercial HVAC business for $8.1 billion—the largest acquisition in Bosch's history.

---

[3] U.S. DEP'T OF JUST., ANTITRUST DIV., HERFINDAHL-HIRSCHMAN INDEX (2024), https://www.justice.gov/atr/herfindahl-hirschman-index [https://perma.cc/5GPF-FTFU].

### 5. The HVAC Equipment Industry Has High Barriers to Entry

167. High barriers to entry deter new competitors from entering the market and make it easier for entrenched participants to collude. The HVAC Equipment industry presents substantial barriers: manufacturing facilities cost hundreds of millions of dollars and take years to bring online. For example, Daikin broke ground on the Daikin Texas Technology Park in 2015; the facility cost $417 million ($590 million today) to build, took more than two years to complete, and employs approximately 5,000 people.

168. New entrants also face formidable brand loyalty to established names like Lennox, Carrier, Trane, Rheem, and York, brands with histories spanning over 100 years. The web of brands operated by Defendants also acts as a barrier to entry—an upstart new entrant must stand out from an artificially large brand crowd to gain inroads with customers, who often view Defendants' sister brands as independent.

### 6. HVAC Equipment Is Largely Commoditized

169. HVAC Equipment is a commodity product—standardized, mass-produced, and sold primarily on price. The technology is well established, and product differentiation is limited. A residential furnace manufactured by one Defendant is designed to be interchangeable with one from another.

170. Furnaces are produced in standard cabinet widths, with British Thermal Units per hour ("BTUh") heating capacities (e.g., 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), and standardized Annual Fuel Utilization Efficiency ("AFUE") ratings expressed as a percentage (e.g., 80%, 90%, and 95%). Heat pumps have heating capacity ratings measured in BTUh, Heating Seasonal Performance Factor 2 ("HSPF2") ratings indicating energy efficiency for heating (e.g., 7.5 HSPF2, 9.5 HSPF2, and 10.5 HSPF2), cooling capacity ratings measured in BTUh, and Seasonal Energy Efficiency Ratio 2 ("SEER2") ratings indicating cooling efficiency (e.g., 13 SEER2, 16 SEER2, and 19 SEER2). A heat pump with a given heating and cooling capacity has a similar footprint to a heat pump with the same capacities produced by a different manufacturer.

171. Air conditioning condensers likewise have similar footprints based on cooling capacity, with cooling capacity ratings measured in BTUh and SEER2 ratings indicating energy efficiency. An air conditioning condenser with a given cooling capacity has a similar footprint to one with the same capacity produced by a different manufacturer.

### 7. Defendants Had Numerous Opportunities to Collude

172. Defendants' high-ranking executives had frequent and regular opportunities to coordinate, including through trade organizations.

**a. The Air-Conditioning, Heating, and Refrigeration Institute**

173. AHRI is the primary U.S. trade association for HVAC Equipment manufacturers. All seven Defendant groups are members. AHRI hosts several events annually.

174. Defendants' senior executives have held leadership roles on the AHRI Board of Directors throughout the Class Period.

175. In 2026, Mike Branson (President of Global Air Division, Rheem) serves as Chairman and Holly Paeper (President of Commercial HVAC, Trane) serves as Vice Chairman, while David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Gaurang Pandya (President of Climate Solutions Americas, Carrier), and Yogi Uemura (President, Daikin) serve on the Board.

176. In 2025, Mike Branson (President of Global Air Division, Rheem) served as Vice Chairman, while David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Gaurang Pandya (President of Climate Solutions Americas, Carrier), Holly Paeper (President of Commercial HVAC, Trane), and Yogi Uemura (President, Daikin) served on the Board.

177. In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman, while Mike Branson (President of Global Air Division, Rheem), David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), and Yogi Uemura (President, Daikin) served on the Board.

178. In 2023, Chris Nelson (President of HVAC, Carrier) served as Vice Chairman, while Gary Bedard (Executive Vice President and President of Residential, Lennox), Mike Branson (President of Global Air Division, Rheem), Doug Schuster (President of Global Air Distribution, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), Yogi Uemura (President, Daikin), and Philip Windham (President and CEO, Nortek Global HVAC, now part of Rheem) served on the Board.

179. From January 31 through February 2, 2022, executives from Carrier, Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHR Expo in Las Vegas. Later, from March 28-30, 2022, executives from Carrier, Goodman Manufacturing (Daikin), Johnson Controls, and Rheem attended the ACCA Annual Conference and Expo in St. Louis. At the ACCA conference, Casey Yates (Johnson Controls), Mike Branson (Rheem), and Justin Keppy (Carrier) participated in an HVAC manufacturers' panel discussion.

180. The AHRI Expo was held on February 2-6, 2023, in Atlanta, attended by executives from Daikin, Johnson Controls, and Rheem. On April 2-5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana, where Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion on the state of the HVAC industry.

181. The AHRI Expo for 2024 was held January 22-24 in Chicago, Illinois, and attended by executives from Carrier, LG, Mitsubishi, and Rheem. The ACCA Annual Conference and Expo followed March 11-14, 2024, in Orlando, Florida, attended by executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem. During this conference, Chris Forth (JCI), Braden Cook (Carrier), John Schneider (Copeland), Doug Widenmann (Daikin), Randy Roberts (Rheem/Ruud), and Heather Buchicchio (Mitsubishi) participated in a panel discussion on the current state of the HVAC industry.

182. The AHRI Expo was held February 10-12, 2025, in Orlando, attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem. On March 23-27, 2025, in Austin, Texas, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo.

### b. Other Industry Conferences

183. Defendants' executives also coordinated outside of trade organizations. At the 13th Annual Morgan Stanley Laguna Conference held September 10-12, 2025, in Dana Point, California, senior executives from Carrier, Trane, and Lennox all presented. Carrier's CFO dismissed the concept of price competition, Lennox's CFO commended the industry's price discipline and discussed his company's forthcoming price increases, and Trane's CEO described efforts to reduce supply, consistent with Lennox's call for discipline.

184. Defendants' executives were also present at the Barclays 43rd Annual Industrial Select Conference held February 17-19, 2026, in Miami, Florida, where Lennox's CFO spoke of the industry's discipline and discussed price increases while Trane's CFO spoke of a matching 5% price increase, while Carrier did the same two days later.

### c. ACHR News

185. Defendants used ACHR News, "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," as a signaling mechanism to perpetuate the conspiracy and communicate their adherence to it. Defendants extensively and nearly exclusively relied on ACHR News to publish and disseminate their price-increase announcements throughout the Class Period.

**FIGURE 14**

**AHRI ARTICLES DOCUMENTING HVAC PRICE INCREASES**




### d. HARDI

186. Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to coordinate. HARDI bills itself as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives, one that "serves its members through government affairs and advocacy efforts, market intelligence and benchmarking, training programs, and world class events."

187. While ostensibly organized to support HVAC distributors, HARDI provided Defendant-manufacturers with further opportunities to collude. At the 2025 HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to

Supplier Manufacturers!" That same conference featured a roundtable discussion for "Manufacturer Reps Only," described as "[e]xclusively for manufacturer representative members, these roundtable sessions offer an engaging space to exchange ideas, share experiences, and refine your professional skills. Guided by the Manufacturer Rep Council, each table-led discussion is designed to provide practical insights, foster collaboration, and help you strengthen your expertise."

**FIGURE 15**

**EXCERPT OF 2025 HARDI ANNUAL CONFERENCE SCHEDULE: SUPPLIER TOWN HALL (EMPHASIS ADDED)**



## FIGURE 16

## EXCERPT OF 2025 HARDI ANNUAL CONFERENCE SCHEDULE: MANAGER REP ROUNDTABLE DISCUSSION (EMPHASIS ADDED)




188. During the Class Period, the HARDI annual conference, held each December, featured speakers from Defendants (such as Trane and Bosch at the 2025 HARDI conference) and was sponsored by at least certain Defendants (such as Bosch, Daikin, and Rheem). HARDI's board of directors during the Class Period also included executives from Trane, Rheem, and Watsco.

## FIGURE 17

## LIST OF SPONSORS OF 2025 HARDI ANNUAL CONFERENCE (EMPHASIS ADDED)



## VII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY

189. Plaintiff and the Class did not have actual or constructive knowledge of their claims because of Defendants' affirmative acts to fraudulently conceal their conspiracy. Defendants' means of effectuating the conspiracy—including price signaling, information sharing, production signaling, and in-person meetings—demonstrate that Defendants actively sought to prevent Plaintiff and members of the Class from discovering the conspiracy. Plaintiff and the Class lacked information that would have placed them on inquiry notice. Through the exercise of reasonable diligence, Plaintiff and the Class could not have discovered the alleged conspiracy until shortly before this filing.

190. Defendants employed veiled language—using terms like "discipline" and "price realization" and speaking of maintaining margins as a priority over competing for market share—to conceal the conspiracy's existence while simultaneously accomplishing its goals and reassuring co-conspirators of their continued commitment to the anticompetitive agreement. Examples include Lennox CEO Alok Maskara's statement that "industry pricing remains disciplined"; Lennox CFO Michael Quenzer's declaration that "the industry's generally been disciplined for the past several years [and] we're gonna continue to increase our pricing to maintain our margins" because lowering prices "does not win market share";

Carrier's Chairman and CEO David Gitlin's assertion that "we believe, as market leaders, that we—it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year"; Johnson Controls Chairman and CEO George Oliver's crediting the "further expanding [of] our margin profile," in part, to the company's "disciplined pricing approach"; and Daikin's talk of avoiding "falling into price wars with our competitors."

191. Defendants also provided pretextual, non-conspiratorial explanations for HVAC Equipment price increases. These pretextual explanations were public and intended to mislead Plaintiff and members of the Class—to divert attention from the conspiracy.

192. Defendants initially blamed supply chain disruptions following the onset of the COVID-19 pandemic in March 2020 as justification for price increases during the Class Period. For example, Rheem subsidiary HTPG sent a price increase letter stating, "The pandemic continues to impact our supply chain, our industry, and the overall economy. Freight, raw materials (steel, aluminum, copper, wood, and plastics) and critical component costs (compressors, valves, and motors) have continued to rise significantly. As a result, HTPG will be implementing a general list price adjustment of 11% on equipment, parts, options, and warranties." Defendants' COVID-related price increases were frequently couched as adjustments

for "inflationary costs" and "cost inflation." Beginning in 2025, Defendants shifted the blame to tariffs. For example, Rheem's Senior VP and General Manager was reported as saying that "tariffs and overall economic conditions have increased the cost of raw materials."

193. Defendants also blamed two federal initiatives for HVAC Equipment price increases during the Class Period: the updated SEER2 energy efficiency standards and the phasedown of HFCs under the AIM Act.

194. The new SEER2 energy conservation standards, which set minimum efficiency requirements for new HVAC Equipment sold beginning on January 1, 2023, were published in the Federal Register on January 6, 2017.[4] Defendants therefore had at least six years to develop compliant equipment. Yet, Defendants still blamed the new standards for price increases. For example, on its website, Lennox claimed, "The new air conditioners will be approximately 10%-15% more than [outgoing models]. The new heat pumps will be approximately 20%-25% more than [outgoing models]. This price increase is due to a more efficient compressor, a

[4] Energy Conservation Program: Energy Conservation Standards for Residential Central Air Conditioners and Heat Pumps, 82 Fed. Reg. 1786 (Jan. 6, 2017), (to be codified at 10 C.F.R. pt. 430), https://www.federalregister.gov/documents/2017/01/06/2016-29992/energy-conservation-program-energy-conservation-standards-for-residential-central-air-conditioners [https://perma.cc/P6M8-GEWV].

more efficient fan motor, a larger coil and cabinet size, and a higher refrigerant charge to achieve the higher efficiency."

195. Under the AIM Act, enacted on December 27, 2020, the U.S. Environmental Protection Agency required the phase-out of R-410A refrigerant, prohibiting the manufacture and import of new air conditioning condensers and heat pumps using R-410A beginning January 1, 2025.[5] On its residential customer website, Lennox blamed HVAC Equipment price increases on the refrigerant transition:

> With any regulatory change, new technology and components are needed to meet the updated standards and requirements. The transition to more environmentally friendly refrigerants is no different. Refrigerants will remain market priced based on supply and demand while the updated line of 2025 complaint [sic] systems will see a rise in price due to the new technology incorporated to maintain efficiency, reliability, and overall system performance.

196. Yet, it was the HVAC Equipment industry that spearheaded the transition away from HFC refrigerants like R-410A, investing billions of dollars and spending more than a decade advocating for the change. Indeed, the industry claimed to have "invested the most and [were] the best prepared" for the transition,

[5] U.S. Env't Prot. Agency, Frequent Questions on the Phasedown of Hydrofluorocarbons (Apr. 2, 2026), https://www.epa.gov/climate-hfcs-reduction/frequent-questions-phasedown-hydrofluorocarbons [https://perma.cc/WZ58-EBTG] (last visited Apr. 10, 2026).

as shown by the 2019 congressional testimony of Stephen Yurek, President and CEO of AHRI:

> More than 15 years ago, the U.S. HVACR industry began investing billions of dollars in R&D to be the first to bring to market next generation refrigerant technologies. More than a decade ago, the U.S. HVACR industry began working with the George W. Bush Administration to initiate discussions under the Montreal Protocol for a global phase down of HFCs. After nearly a decade of advocacy by the U.S. HVACR industry, these discussions culminated in the Kigali Amendment to the Montreal Protocol in 2016. The Kigali Amendment intensified the global competition over next generation refrigerant technologies in the fast-growing international HVACR market. American-based companies have invested the most and are the best prepared to benefit from a global transition out of HFCs and into American-made next generation refrigerant technologies.

197. Plaintiff and the Class had no ability to determine the accuracy of these pretextual explanations for price increases that Defendants communicated to the public.

198. In the days following a lawsuit filed on March 20, 2026, alleging that Defendants were engaged in a price-fixing conspiracy, the shares of the publicly-traded Defendants—Lennox, Carrier, Trane, and Johnson Controls—all fell sharply. That the market reacted to the price-fixing lawsuit by selling off stock of the Defendant companies is evidence that Defendants were concealing the conspiracy even from investors.

199. Furthermore, Defendants state in publicly available documents that they complied with the antitrust laws, all while colluding to fix, raise, and stabilize the prices of HVAC Equipment at the expense of the Class. For example:

200. Trane's Code of Conduct states it is employees' "responsibility to compete fairly and never collude with outside parties by entering into improper agreements that could restrict or distort competition."

201. Lennox's Code of Business Conduct says it "conduct[s] [its] business in accordance with all applicable antitrust, competition, and trade practice laws" and that it "avoid[s] even the appearance of unfairly restricting competition."

202. Carrier's Corporate Policy Manual has an "Antitrust Compliance Program" section, stating that "[e]very employee must learn and comply with Carrier antitrust policies and procedures to ensure strict compliance with all applicable antitrust laws."

203. Rheem's Supplier Code of Conduct states that "Rheem suppliers must comply with all applicable laws and regulations."

204. Daikin's Supplier Code of Conduct says that "[s]uppliers must observe the rules of fair competition and antitrust, complying with all applicable laws and regulations" and that they "must refrain from forming cartels or engaging in anti-

competitive arrangements or agreements, or concerted practices deliberately or incidentally designed to bypass, restrict, or distort competition as defined by applicable antitrust laws."

205. Bosch's Code of Conduct has a "[c]ompetition and antitrust law" section, stating that Bosch "observe[s] the rules of fair competition as particularly defined by antitrust laws" and that it "do[es] not reach agreements with [its] competitors on allocation of territories and customers, prices, and components of prices."

206. AAON's Code of Business Conduct and Ethics says it "seek[s] to outperform [its] competition fairly and honestly" and that it "seek[s] competitive advantages through superior performance, never through unethical or illegal business practices."

207. Defendants' fraudulent concealment tolls the applicable statutes of limitations and equitably estops Defendants from asserting any statute of limitations defense.

## VIII. CLASS ACTION ALLEGATIONS

208. Plaintiff brings this action on behalf of himself and under Federal Rule of Civil Procedure 23(a) and (b)(3) as a representative of a Class defined as:

> All entities and persons who directly purchased HVAC Equipment in the United States at least as early as January 1, 2020 through the present from one or more of the Defendants and their co-conspirators.

209. Specifically excluded from the Class are: (1) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant; (2) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any business majority-owned by any such person; (3) any Co-Conspirator identified in this Action; and (4) any federal governmental entities.

210. The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members, but the above-defined Class is readily identifiable and is one for which records should exist. Given the nature of the HVAC Equipment industry, the Class encompasses at least thousands of direct purchasers across the United States.

211. Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all members of the Class. Relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to:

a. Whether Defendants engaged in a conspiracy to artificially inflate, increase, and stabilize HVAC Equipment prices;

b. The identity of the participants in the conspiracy;

c. The duration of the conspiracy and the acts performed by Defendants in furtherance of the conspiracy;

d. Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

e. The effect of Defendants' conspiracy on the price of HVAC Equipment sold in the United States during the Class Period; and

f. The amount of class-wide damages.

212. These and other common questions of law or fact predominate over any questions affecting only individual members of the Class.

213. Plaintiff's claims are typical of the claims of members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for HVAC Equipment sold in the United States as a result of Defendants' price-fixing in the HVAC Equipment industry.

214. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of other members of the Class. Plaintiff's interests are coincident with, typical of, and not antagonistic to, those of other members of the Class.

215. Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions across myriad industries and courts throughout the nation.

216. Defendants acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

217. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, prosecution of separate actions by individual

members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

218. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX. ANTITRUST INJURY

219. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition for HVAC Equipment has been restrained or eliminated;

b. HVAC Equipment prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c. Plaintiff and the Class have been deprived of free and open competition; and

d. Plaintiff and the Class have paid and continue to pay artificially inflated HVAC Equipment prices.

220. The HVAC Equipment that Plaintiff and the Class purchased was purchased directly from Defendants. The overcharges on HVAC Equipment can therefore be traced directly from Defendants to Plaintiff and the Class.

221. As direct purchasers, Plaintiff and members of the Class paid supracompetitive prices at the point of sale. Plaintiff and the Class suffered antitrust injury in the form of overcharges paid directly to Defendants because of the price-fixing conspiracy alleged herein.

222. Commonly used and well-accepted economic models can measure both the extent and the amount of the supracompetitive prices paid by Plaintiff and members of the Class. The economic harm to Plaintiff and the Class can therefore be quantified.

223. The purpose of Defendants' collusive conduct was to raise, fix, stabilize, or maintain the price of HVAC Equipment and, as a direct and foreseeable result, Plaintiff and members of the Class paid supracompetitive HVAC Equipment prices during the Class Period.

224. By reason of the alleged antitrust violations, Plaintiff and members of the Class have sustained injury to their businesses or property, having paid higher HVAC Equipment prices than they would have paid absent Defendants' illegal contract, combination, or conspiracy, and have suffered damages as a result.

225. This is an antitrust injury of the type that federal antitrust laws were designed to punish and prevent.

## X. CLAIMS FOR RELIEF

### COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. §1) FOR RESTRAINT OF TRADE

226. Plaintiff incorporates and re-alleges, as though fully set forth herein, each allegation set forth in the preceding paragraphs of this Complaint.

227. Beginning on or around January 1, 2020, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, and continuing through the present, Defendants entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating price competition for HVAC Equipment.

228. Defendants combined and conspired to raise, fix, maintain, or stabilize the price of HVAC Equipment sold to United States purchasers during the Class Period. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action between and among Defendants.

229. As a result of Defendants' unlawful and unreasonable conduct and acts taken in furtherance of their conspiracy, the price of HVAC Equipment sold to direct purchasers in the United States during the Class Period was raised, fixed, maintained, or stabilized at artificially inflated levels.

230. As a result, Plaintiff and members of the Class were deprived of free and open competition and have been injured in their business and property in that they have paid more for HVAC Equipment during the Class Period than they otherwise would have paid but for Defendants' conduct. The injury is of the type that the Sherman Act was designed to prevent and flows from that which makes Defendants' conduct unlawful.

231. Plaintiff and the Class are entitled to recover treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), together with costs of suit and reasonable attorneys' fees. Plaintiff and the Class are also entitled to an injunction against Defendants pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), preventing and restraining the violations alleged herein, and equitable relief.

232. Defendants' conspiracy is ongoing. Absent injunctive relief, Defendants will continue to coordinate HVAC Equipment prices to the detriment of Plaintiff and the Class. Plaintiff and the Class face a threatened loss or damage by reason of Defendants' continuing violation of the antitrust laws. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, Plaintiff and the Class seek injunctive relief including, but not limited to, an order:

a. declaring that Defendants' conduct as alleged herein violates Section 1 of the Sherman Act;

b. enjoining Defendants from continuing, maintaining, or renewing the conspiracy alleged herein, or from engaging in any other conspiracy having a similar purpose or effect;

c. enjoining Defendants from communicating with one another regarding current or future HVAC Equipment pricing, production levels, or supply management, except as necessary for legitimate joint ventures or standard-setting activities subject to appropriate antitrust safeguards; and

d. requiring Defendants to implement antitrust compliance programs with independent monitoring sufficient to prevent recurrence of the unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully requests that the Court:

A. Certify this action as a class action, with Plaintiff as the designated Class representative and the below-signed counsel as Class Counsel;

B. Determine that Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. §1), and that Plaintiff and the members of the Class have been injured in

their business and property because of Defendants' and their co-conspirators' violations;

C. Award Plaintiff and the members of the Class damages sustained by them, as provided by the federal antitrust laws, and enter a judgment in favor of Plaintiff and the Class against Defendants in an amount to be trebled to the extent such trebling is permitted by law;

D. Award Plaintiff and the members of the Class restitutionary relief to the extent afforded by applicable law;

E. Permanently enjoin and restrain Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf, from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F. Award Plaintiff and the members of the Class pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial Complaint in this action;

G. Award Plaintiff and the members of the Class their costs of this suit, including reasonable attorneys' fees as provided by law; and

H. Grant such other or further relief as may be just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: May 22, 2026

**WEITZ & LUXENBERG P.C.**

/s/ Paul F. Novak
Paul F. Novak (P39524)
Diana Gjonaj (P74637)
Michael P. Piggins (P81240)
The Fisher Building
3011 W. Grand Boulevard, Floor 24
Detroit, MI 48202
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
mpiggins@weitzlux.com

Patrick McGahan
Michael Srodoski
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Karin E. Garvey
Fatima Brizuela
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444

Facsimile: (212) 223-6443
kgarvey@scott-scott.com
fbrizuela@scott-scott.com

Patrick Coughlin
Carmen Medici
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com

David E. Kovel
Thomas W. Elrod
Sarah E. Flohr
James Isacks
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
sflohr@kmllp.com
jisacks@kmllp.com

Robert J. Gralewski, Jr.
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
Email: bgralewski@kmllp.com

Brant D. Penney
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
80 So. 8th Street, Suite 900
Minneapolis, MN 55402
Tel: 651-287-2100
b.penney@rwblawfirm.com
g.blanchfield@rwblawfirm.com

*Attorneys for Plaintiff*